(Decided 18th March, 1890.)

## THE TRUSTEES OF THE CATHOLIC CATHEDRAL CHURCH OF BALTIMORE *vs.* CLEVELAND P. MANNING.

*Religious societies—Right to Acquire land—Burial ground—*
*Power of the Legislature—Legislative sanction of Purchase*
*of Land by Religious corporation—Certificates of Burial*
*lots—Constitutional law.*

Article 34 of the Declaration of Rights of 1776, which provided that every sale or grant of lands to any religious sect, order, or denomination without the leave of the Legislature, should be void; except a sale of land, not exceeding two acres, for a church, meeting, or other house of worship, or for a burying ground, imposed no restriction upon the Legislature in giving such leave, but authorized it, in its discretion, to prescribe conditions and to declare limitations, both as to the extent and quality of the estate to be purchased and as to the uses to which it should be devoted.

If the restrictions related to the extent and quality of the estate—confined that estate to one for life or years, or to any other less than a fee—no mere Act of Assembly could ever afterwards enlarge that qualified estate, when purchased, into an absolute one, because the rights of persons entitled to the reversion could not be thus interfered with. But if the restrictions annexed to the "leave," while not affecting the quality of the estate, prescribed the purposes for which the property should be used, a subsequent Legislature, with the assent of the grantee, would have the right not only to change, but to abrogate altogether, those restrictions, where the title acquired under the grant was a title in fee.

Trustees of Catholic Cathedral Church of Balto. *vs.* Manning.

The Act of 1814, ch. 2, authorized and empowered a religious cor-
poration to purchase land, not exceeding six acres, and to hold
the same for a burial ground, and for no other use or purpose
whatever. A lot of ground was thereupon purchased and used
as a burying ground. By the Act of 1886, ch. 280, authority
was given to the Mayor and City Council of Baltimore to open
streets and alleys through the property thus purchased, and per-
mission was given to the corporation to remove all bodies in-
terred therein, and to re-inter them in some other cemetery be-
longing to the corporation; and it was also declared that when
the bodies were all removed and re-interred, and the vaults,
monuments, and structures, all re-erected elsewhere, the cor-
poration should thereupon acquire the full ownership in fee sim-
ple of the property, and might sell and convey the same, so as
to vest in the grantee a title free, clear, and discharged from the
claims of all persons whatsoever. HELD:

That by the Act of 1814, ch. 2, the corporation was authorized to
acquire a fee simple title in the six acres of land, subject to the
restriction thereby imposed as to its use, and by the Act of 1886,
ch. 280, this restriction was removed.

A religious corporation having, under the authority of the Legis-
lature, acquired six acres of land to be used as a burial ground,
afterwards purchased six and a half acres additional. This latter
purchase was invalid having been made without the sanction of
the Legislature. Subsequently, by the Act of 1845, ch. 384, the
corporation was authorized to enlarge their burying ground, of
which the six and a half acres was a part, to an extent not ex-
ceeding in the whole twenty-five acres. HELD:

That the Act of 1845, was a subsequent ratification or sanction of
the purchase of the six and a half acres of land, although no
special reference to such purchase was made in the Act; and such
sanction was a sufficient compliance with the provisions of
Article 34, of the Declaration of Rights.

Certificates of lots in a cemetery issued by a religious corporation,
conveyed no title to the land, such certificates not being acknow-
ledged in the way pointed out in the Act of 1766, ch. 14, sec. 2,
which was in force at the time, and which provided that no
estate in land of above seven years duration could pass, unless
the deed conveying the same was acknowledged in the way indi-
cated in the Act or in some one of its supplements. The only
effect, as well as object, of such certificates was to grant the

privilege of interment, so long as the ground continued to be used for the purpose of burial.

The Act of 1886, ch. 280, authorizing the Mayor and City Council of Baltimore to open streets through a cemetery, repealing prior Acts forbidding it to be done, and providing for the removal of the bodies interred therein, and for the disposition of the land when the bodies should have been removed, does not violate section 29 of Article 3 of the Constitution which declares that "every law enacted by the General Assembly shall embrace but one subject, and that shall be described in the title."

APPEAL from the Circuit Court No. 2, of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, FOWLER, and McSHERRY, J.

*Charles J. Bonaparte*, and *Bernard Carter*, for the appellant.

*William F. Lucas, Jr.*, for the appellee.

McSHERRY, J. delivered the opinion of the Court.

By chapter 15, of the Acts of Assembly of 1795, a corporation named and styled the "Trustees of the Roman Catholic Church in the Town of Baltimore" was created, and it was declared "capable in law to purchase, take, hold, receive, and enjoy * * * * in fee simple, or for any lesser estates, any property, real, personal, or mixed, which, by the Constitution and laws of this State, may be acquired and held by religious societies." The corporate name was changed by the *Act of* 1820, *ch.* 84, to the "Trustees of the Catholic Cathedral Church of Baltimore." In 1814, (*Acts of* 1814, *ch.* 2,) the corporation was "authorized and em-

powered to purchase a lot of ground in Baltimore County, not exceeding six acres; and to hold the same   *   *   * as and for a burial ground for the members of said Church, and for no other use or purpose whatever." On the .10th day of February following Basil S. Elder, for a full and adequate consideration, conveyed to the "Trustees of the Roman Catholic Church in the Town or Baltimore, their successors and assigns," a parcel of land containing six acres, "to have and to hold unto the said Trustees of the. Roman Catholic Church in the Town of Baltimore, their successors and assigns, to the only proper use and behoof of the said trustees, their successors and assigns forever, and for and upon none other trust or use whatever." This land was thenceforth used as a burying ground until about March, 1887. On the fifth day of November, 1841, William L. Smith, for a consideration admitted to have been the full value of the land, conveyed to the Trustees of the Catholic Cathedral Church of Baltimore, six and a half acres of land, "to have and to hold the said ground and appurtenances unto the Trustees of the Catholic Cathedral Church of Baltimore and its assigns forever, to their only use and behoof." This land was also used from that time until about March, 1887, as part of the Cathedral Cemetery. In 1845, (*Acts of* 1845, *ch.* 384,) the Legislature passed an Act which recited in the preamble: "Whereas, the Trustees of the Catholic Cathedral Church of Baltimore, by their petition to this General Assembly, have represented that the ground *now used* by the congregation of said church as a burial ground, was *purchased* for *that* purpose, and was so used before the last enlargement of the City of Baltimore, but that the commissioners appointed to lay out streets, have located several streets through the said ground, which if opened as located, would produce great inconvenience; and whereas, the trustees of the said church have also asked permission

*to extend* their said burial ground by purchase from the owners of the adjacent lands, which request is reasonable and ought to be granted;" and then provided by sec. one, that the said trustees "be, and they are hereby, authorized and empowered to add to and enlarge their burying ground to an extent not exceeding in the whole twenty-five acres of land;" and by sec. 2, "that it shall not be lawful to open any street, lane, or alley through the burial ground of the Trustees of the Catholic Cathedral Church of Baltimore, *heretofore* acquired, or hereafter to be acquired, without "the sanction of the General Assembly." Lots in said cemetery were sold by the corporation, and certificates were given declaring that the purchasers should hold the lots unto them, their heirs and assigns forever, but to be used only for burial grounds. In 1886, (*Acts of* 1886, *ch.* 280,) the General Assembly passed an Act entitled "An Act to authorize the Mayor and City Council of Baltimore to open streets and alleys through the property known as the 'Cathedral Cemetery in Baltimore City,' and to confer certain powers on the trustees of said cemetery." By the first section of this Act all provisions in previous statutes prohibiting the opening of streets and alleys through the Cathedral Cemetery were repealed. By subsequent sections the trustees were directed, whenever by reason of the opening of streets through the cemetery, or from any other cause, the said cemetery shall become, in the judgment of the trustees, unsuitable for the purpose of sepulture, to remove all bodies interred therein, and to reinter them in some other cemetery belonging to the said corporation, and to re-erect in such other cemetery all vaults and monuments taken from the old burying ground. By the third section the Legislature declared that when the bodies were all removed and re-interred, and the vaults, monuments, and structures all re-erected elsewhere, the corporation "shall thereupon acquire the full ownership

in fee simple of the part or portion aforesaid'' (that is,
deemed unsuitable for sepulture,) "and may by its deed
duly executed, acknowledged, and recorded, sell, lease,
mortgage, or otherwise convey the same so as to vest in
the grantee thereunder a title free, clear, and discharged
from the claims of all persons whatsoever.'' The Mayor
and City Council provided by ordinance for opening streets
through the cemetery, and the trustees thereupon deter-
mined that in their judgment the burial ground com-
monly know as the "Cathedral Cemetery" had become
and was unsuitable for the purposes of sepulture. The
bodies, vaults, and monuments have now all been re-
moved. The trustees afterwards contracted with Cleve-
land P. Manning, the appellee, to sell to him portions of
the land conveyed by the Elder and the Smith deeds; but,
doubts having been expressed as to whether the corpo-
ration could convey a perfect title, he declined to com-
plete the purchase, and a bill was thereupon filed against
him seeking a specific performance of the contract. By
agreement a *pro forma* decree was entered dismissing the
bill, and from that decree this appeal has been taken.

By Art. 34 of the Declaration of Rights of 1776, it
was provided "That every gift, sale, or devise of lands
to * * * * any religious sect, order, or denomina-
tion, * * * * without the leave of the Legislature,
shall be void; except, always, any sale, gift, lease, or
devise of any quantity of land, not exceeding two acres,
for a church, meeting, or other house of worship, and
for a burying ground, which shall be improved, enjoyed
or used only for such purpose, or such sale, gift, lease
or devise shall be void.'' This Article imposed a restric-
tion upon the acquisition of property by religious sects,
orders, and denominations, though it reserved to the
Legislature the power to remove that restriction. There
are no prohibitory words used in the Article with respect
to this power of the Legislature, and there are no limi-

tations or conditions prescribed with regard to the exercise of it. The whole subject was left to the sound discretion and the wisdom and good judgment of the General Assembly. "Plenary power in the Legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception." *People vs. Draper,* 15 *N. Y.,* 543; *Lewis' Appeal,* 67 *Pa. St.,* 153. Or, as stated by Judge COOLEY: "The rule of law upon this subject appears to be, that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case." *Cooley Con. Lim.,* 204, (*4th Ed.*) We do not mean to decide whether the doctrine thus broadly stated is or is not subject to some qualification, *Regents, &c. vs. Williams,* 9 *G. & J.,* 408; *Mayor, &c. vs. State, &c.,* 15 *Md.,* 469, because the question before us does not require us to pass upon that subject. We merely state the general rule.

Without pausing to consider the reasons which induced the adoption of this Article of the Declaration of Rights, it is very apparent, from its language alone, that there were two classes of sales or grants to which that Article was intended to apply. We speak of sales or grants only, because they alone are involved in this controversy. These two classes were, to state them in an inverse order, first, sales or grants to any religious sect, order or denomination where the *quantity* of land conveyed did not exceed two acres, and where what was conveyed was intended for a church, meeting, or other house of worship, or for a burying ground; and secondly, sales or grants where the quantity of land conveyed was not limited to two acres, but where the land was intended either for the purposes just specified, or for any other or different objects. No "leave" of the Legislature was necessary to make valid, grants of the des-

cription first mentioned; but the conditions, and the only conditions, upon which that validity depended were, that the quantity of land did not exceed two acres, and that the use to be made of the property was, at least, one of those specified in the Article quoted. These conditions existing, and properly appearing, the grant was valid, without any legislative action whatever. Secondly, all other sales or grants to religious sects, orders, and denominations were declared void unless made with the "leave" of the Legislature. But necessarily every grant which without such "leave" would have been void, was, by force of the Article itself, valid and effective if made *with* such leave; and this too without the slightest reference to the uses made of the land, if the "leave" or the muniment of title prescribed no conditions in this particular. As, therefore, the power to sanction such sales or grants was left by the Bill of Rights in the General Assembly, (where it inherently resided) without restrictions or qualifications of any kind, it follows that, in giving "leave" to a religious sect, order, or denomination to acquire property which without such leave it could not have lawfully acquired, the Legislature was undoubtedly authorized, in its discretion, to prescribe conditions and to declare limitations, both as to the extent and quality of the estate to be purchased, and as to the uses to which the property when purchased should be devoted. The right to do this was a necessary incident of the power itself. If the restrictions related to the extent and quality of the estate—confined that estate to one for life or years, or to any other less than a fee—no mere Act of Assembly could ever afterwards enlarge that qualified estate, when purchased, into an absolute one, because the rights of persons entitled to the reversion could not be thus interfered with. But if the restrictions annexed to the "leave," whilst not affecting the quality of the estate, prescribed the pur-

poses for which the property should be used, there is no principle which would prevent a subsequent Legislature, with the assent of the grantee, from changing or even abrogating altogether, those restrictions, where the title acquired under the grant was a title in fee. This is essentially so by reason of the comprehensive nature of the power we are considering.

Now, the conveyance from Basil Elder to the appellant, in 1815, was clearly not one of those sales or grants valid under the Declaration of Rights without legislative sanction. The quantity of land conveyed exceeded two acres, and the deed is silent as to the uses for which the land was intended. The Act of 1814, ch. 2, permitted the appellant to *purchase* six acres of land, and declared that it should *hold* that land for the purposes of sepulture, and for no other purpose whatever. Here then, was a prior "leave" granted to acquire the property; but coupled with that leave there was a declaration that when purchased the land should be held,— that is, used,—for a particular purpose. The Act therefore authorized the appellant to do two things; first, to *purchase* six acres of land, without imposing any restrictions as to the extent or quality of the estate to be purchased; and secondly, to *hold* the land, when purchased, for a particular purpose. This, for the reasons heretofore stated, it was entirely competent to the Legislature to do, and that the Legislature intended to do it is apparent, not only from the plain import of the language used in the statute, but also from two additional circumstances; viz., first, precisely the same thing had been previously, and was subsequently, done in even more explicit and emphatic terms in many other instances; and, secondly, the Legislature itself in later enactments (1821, *ch.* 45; 1886, *ch.* 280) placed its own interpretation on the Act of 1814, and defined the extent and quality of the estate originally authorized to be acquired

under it.   An example of the first named series of enactments is furnished by the Act of 1794, *ch.* 44, which empowered the vestry of Saint Paul's parish in Baltimore County to purchase one or more parcels of ground, not exceeding three acres, whereon were to be erected, for the performance of divine worship, one or more churches, to each of which a burial ground was directed to be attached.   For those uses and purposes the vestry were authorized "to take one or more deeds to the said vestry, and their successors, forever * * * * * and the vestry of the said parish, and their successors, shall be vested with an estate in fee simple therein." This Act enabled the vestry to purchase a fee simple estate, but restricted the use to be made of the land when acquired.   Many similar statutes might be cited.

Whilst a legislative construction of a prior Act of Assembly is not always to be relied on as a safe guide, *Allen vs. Mut. Fire Ins. Co.*, 2 *Md.*, 117, still, where the Legislature says distinctly or in effect that by an antecedent statute, a particular right was intended to be conferred, the Courts will ordinarily respect that declaration, if the language used in the earlier Act can be so interpreted without doing violence to its obvious and natural meaning.   Now, the *Act of* 1821, *ch.* 45, authorized the appellant to borrow $50,000 and to issue certificates, which were made liens on its real property.   The Act further provided, "that if the said trustees should judge it to be for the interest of the said corporation to dispose, either at public or private sale, of the whole or any part of their property, excepting the square of ground on which the Cathedral Church stands, it shall be lawful for them to do so;" and the trustees were directed to apply the proeeeds of such sale to the reduction of the debt so authorized to be incurred.   This was an explicit declaration that the estate acquired six years before, in conformity with the Act of 1814, was such as

Trustees of Catholic Cathedral Church of Balto. *vs.* Manning.

could be charged with liens in favor of creditors who might lend money on the faith of an absolute title, and such as could be sold for the payment of those liens. Necessarily, therefore, it was a declaration that the Act of 1814 had authorized the purchase of a fee simple estate; because, if it had only authorized the acquisition of a determinable fee, the moment a sale under the Act of 1821 had been attempted, the title of the appellant would have been divested, and creditors who had relied in good faith on this legislation, would have been deprived of their liens, and would, most probably, have lost the money loaned by them on the security of this identical property. The Legislature would never have permitted this property to be thus incumbered, if it had not supposed the appellant's title thereto was absolute. The Act of 1886 is even more emphatic, as the extracts quoted from it abundantly show.

Just here it may not be amiss to observe that the provision of the Act of eighteen hundred and fourteen, requiring the appellant *"to hold"* the land for a particular purpose, is not, as was contended in the argument at the bar, equivalent to the *habendum* of a deed, and cannot be treated as though incorporated in the conveyance of 1815, and as therefore qualifying the estate actually granted. The *habendum* of a conveyance is created by the use of the verb *"to have,"* and that verb is not found in the statute in connection with the character of the estate authorized to be purchased. The verb used is *"to hold,"* and that in a grant would designate the *tenendum;* and the *tenendum* is now of very little use and is only kept in by custom. It never qualified the estate conveyed, as the *habendum* might have done, and may still do when not in conflict with or repugnant to the premises. The *tenendum* indicated the tenure by which the estate granted was to be holden, viz., *tenendum per servitium militare, in burgagio, in libero socagio, &c.,* 1 *Bl. Com.,* book 2, ch. 20, *side page* 298.

The deed to the appellant executed after the passage of the Act of 1814, conveyed what the appellant was by that Act, authorized to acquire, the fee-simple title to six acres of land. Under that deed the whole estate passed out of Elder and vested in the appellant. The *use* to be made of the land was restricted, not by the deed, not by any contract, but solely by the statute, by the mere will of the Legislature. By a change of that use under legislative authority, no greater estate was conferred upon the appellant, and no vestage of title was taken from Elder or Elder's heirs. The Legislature did by the Act of 1886, *ch.* 280, only that which it might have done by the Act of 1814. It need not, under the latter Act, have restricted the use of the land to the purposes of sepulture. Having, however, done so, it possessed the power, with the assent of the appellant at all events, to change that restriction or to remove it entirely. The appellant holds now precisely the same *title* that it held prior to the passage of the Act of 1886, *ch.* 280, though since the adoption of that Act the restriction as to the *use* of the land is no longer in force. Since, then, the title which the appellant originally acquired under the deed of 1815, and which, under the Act of 1886, it may now dispose of, was an absolute, unqualified fee, it has a marketable title, unless other objections to be considered later on are sufficient to defeat a conveyance by it.

The cases of *Grove vs. The Trustees of the Congregation, &c.*, 33 *Md.*, 451, and *Reed, Howard, et al. vs. Stouffer, et al.*, 56 *Md.*, 236, are clearly distinguishable from the one at bar. In 1787, John Eager Howard conveyed to nine named persons and their successors in trust, for the Society of German Baptists, less than two acres of land, but did not specify in the deed the purposes for which the conveyance was made. In 1808, he conveyed the same land to thirteen named individuals, including four of the original trustees, by another deed, wherein

it was stated that the lot of ground was to be used as a burial ground for the remains of the members of the Society of German Baptists, and "that any house erected or to be erected thereon should and might" be used as a place of worship for the said society. In the case in 33 *Md.*, this Court held the deed of 1787 void, because, though it granted less than two acres, it did not purport to be a conveyance for any of the purposes mentioned in the Declaration of Rights, and no Act of Assembly had ever been passed sanctioning the grant. In the case in 56 *Md.*, in passing upon the deed of 1808, it was held that, inasmuch as the purposes for which the land was conveyed were particularly set forth in that deed, the property could not be sold or applied to any other use; and that any attempt to sell or so apply it would cause it to revert to the heirs of the original grantor. Now, had the deed of 1787, specified the objects for which the land was conveyed it would have been valid without any "leave" of the Legislature, because the quantity of land conveyed was less than two acres. Or, had the "leave" of the Legislature been obtained the deed would have been valid though it did not set forth the objects of the grant. But the deed of 1808, did set forth those objects, and therefore conveyed only a conditional or determinable fee, and in 56 *Md.*, 254, it was said, the lot "must be held and used in strict conformity to the terms of the deed by which it was conveyed, and for the uses therein specially declared. Should it be diverted from those uses, the terms of the deed, under which alone it is now held, would be violated, and the heirs of General Howard would immediately become re-invested with the title to the lot." As we have said, the Elder deed does not convey such a limited estate, but a fee simple and the Act of 1814, gave the appellant "leave" to so acquire the property. The deed of 1808, belonged to the first class of grants affected by Article 34, of the Decla-

ration of Rights, whilst the deed of 1815 belonged to the other class.    One deed conveyed a determinable fee, the other an absolute fee.    The difference is, therefore, an obvious one.

We come now to the Smith deed of 1841.    Much of what has been said in regard to the Elder deed applies to the deed of 1841.    Assuming, but not deciding, that the Act of 1820, ch. 84, did not give the appellant "leave" to acquire the property conveyed by the deed of 1841, the Act of 1845 was, nevertheless, a subsequent ratification or sanction of that purchase.    When the *Act of* 1845, *ch.* 384, was passed the land conveyed by the deed of 1841, was actually in use as part of the appellant's cemetery.    The appellant asked permission to extend its burial ground,—a request which the Legislature thought was reasonable, and ought to be granted.    Accordingly the appellant was empowered "to add to and enlarge" its cemetery "to an extent not exceeding in the whole twenty-five acres of land."    The land it *then* held and used as a burial ground was the land it was empowered *to add to* until what might be so added made with what was then held, twenty-five acres in the aggregate.    The land conveyed by Smith, being then part of the cemetery was that, or part of that, which was to be added to or enlarged.    In effect, the Legislature said to the appellant, you now hold, for burial purposes, certain land which you have already purchased; you may not only continue to hold that, but you may add to it by purchasing more, up to the limit named.    By the second section of the Act, *all* land *theretofore* acquired by the appellant, and *then* used for the purposes of sepulture— and the Smith land had been *theretofore* acquired and was *then* used for those purposes—was expressly exempted from appropriation for public streets, because held and used as a burial ground; and, in the judgment of the Legislature, it was lawfully so held and used.    We have no

Trustees of Catholic Cathedral Church of Balto. *vs.* Manning.

difficulty in holding that the Act of 1845 amounted to, and was, a subsequent "leave" or sanction; and it only remains to inquire whether such a sanction is a sufficient compliance with the provisions of the Declaration of Rights as it then stood.

A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period down to the year 1864, when the language of the Declaration of Rights was changed from "leave" to "prior or subsequent sanction," furnishes a very strong presumption that the intention is rightly interpreted. "And when this has been given by officers in the discharge of their official duties, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight." *Cooley Con. Lim.*, 82. And Chief Justice MARSHALL said in *Cohens vs. Virginia*, 6 *Wheat.*, 418, "great weight has always been attached, and very rightly attached, to contemporaneous exposition." *Mayor, &c. of Baltimore vs. State, &c.*, 15 *Md.*, 376; *Burgess vs. Pue*, 2 *Gill*, 11; *State vs. Mayhew*, 2 *Gill*, 487. Numerous Acts of Assembly were passed, beginning shortly after the adoption of the Declaration of Rights of 1776, and continuing down to 1864, giving "leave" *after* the grant or devise had been made, and upon the validity of such legislation many titles to valuable estates now depend. Illustrations of this legislation are furnished by the *Acts of* 1793, *ch.* 20; 1804, *ch.* 44; 1805, *ch.* 2; 1806, *ch.* 43; 1817, *ch.* 67; *ch.* 155; *ch.* 187; 1818, *ch.* 13; *ch.* 43; 1819, *ch.* 74; 1823, *ch.* 79; 1833, *ch.* 49; 1835, *ch.* 214; 1836, *ch.* 38; 1837, *ch.* 107; 1841, *ch.* 175; 1845, *ch.* 60; *ch.* 308; 1850, *ch.* 245; 1853, *ch.* 61; *ch.* 64; 1856, *ch.* 62; *ch.* 65; *ch.* 126;

*ch.* 144; 1858, *ch.* 233; *ch.* 344; 1860, *ch.* 123; 1864, *ch.* 259, and a very large number of other similar enactments.

It is too late, at this day, to question the right of the Legislature to pass such confirmatory Acts.    But it has been objected that special reference should have been made in the Act of 1845 to the particular grant intended to be sanctioned; and that, without such reference, the Act of 1845 is inoperative as a confirmation of the deed of 1841.    In support of this position the cases of *Orrick, et al. vs. Boehm, et al.*, 49 *Md.*, 85; *Church Extension of the M. E. Church, et al. vs. Smith, &c.*, 56 *Md.*, 362, have been referred to.    These were cases arising under *wills*. In the case last cited this Court said: "In our opinion the sanction of the Legislature contemplated and required by that Article must be expressly given to each particular devise or bequest, in order to render it valid." Devises and bequests are generally mere gratuities.    Testators may be induced to make them in favor of religious sects, orders, or denominations, under circumstances and conditions which suggest that such dispositions were illjudged, unwise or even the results of undue and improper influences.    Such cases *might* arise, and that mere possibility is a sufficient reason to make it eminently just that *each devise* and *bequest*, falling within the Constitutional restriction, should be subjected to a fair scrutiny by the General Assembly before sanctioning it.    But a grant founded on a full and valuable consideration stands on an entirely different footing.   ·It is not a gratuity. It does not depend on the death of the grantor to make it operative.    It is the result of a transaction between living people, and is not subject to the influences which might improperly control a devise or a bequest.    The reasons which may have suggested the rule laid down with regard to devises and bequests do not apply to conveyances upheld by adequate considerations; and to

.Trustees of Catholic Cathedral Church of Balto. *vs.* Manning.

include such grants within the rule would be manifestly illogical and arbitrary; particularly as the difference between these two modes of acquiring property by religious sects, orders, and denominations is such that power to acquire title by *gift* does not include or embrace power to take by *will. Brown, Adm'r, et al. vs. Thompkins, et al.,* 49 *Md.,* 431. We, hold, therefore, that the Act of 1845, though not specially or in terms referring to the conveyance of 1841, confirmed and sanctioned that conveyance as fully as if direct reference had been made thereto. It follows that the Smith deed of 1841 to the appellant is valid, and that the appellant may lawfully sell and convey the land acquired under it, if there be no other difficulties in the way.

We are now brought to the consideration of the other objections urged against the right and power of the appellant to sell and convey the property acquired by it under the deeds of 1815 and 1841.

It has been insisted that the purchasers of lots in the old Cemetery acquired under the certificates issued to them titles of which they cannot now be deprived against their consent. These certificates undoubtedly purport to convey the *title* to the lots, but, though some of them were recorded, no one of them was ever acknowledged. By the *Act of* 1766, *ch.* 14, *sec.* 2, in force when these certificates were executed by the appellant, no estate in land of above seven years duration could pass unless the deed conveying the same was *acknowledged* in the way pointed out in that Act or in some one of its supplements. No title, therefore, passed under these certificates. But the real and only effect, as well as the object, of these certificates, was to grant the privilege of interment so long as the ground continued to be used for the purposes of burial. *Rayner vs. Nugent and Brown,* 60 *Md.,* 518.

The remaining objection relates to the constitutionality of the *Act of* 1886, *ch.* 280, and about that we have

no difficulty at all. It was argued that the Act is in
contravention of Article 3, sec. 29, of the Constitution of
Maryland. That section declares that "every law en-
acted by the General Assembly shall embrace but one
subject, and that shall be described in its title." It is
insisted that the Act of 1886 embraces more than one
subject. The Act was designed to give the Mayor and
City Council of Baltimore, power to open streets through
the Cemetery. It therefore repealed prior Acts forbid-
ding that to be done, and it necessarily made provision
for the removal of the remains interred where the beds of
such streets were located, and for the removal of remains
interred elsewhere in the Cemetery, if the opening of
those streets rendered the ground no longer fit or suit-
able as a place of sepulture. If the remains were all
removed, it followed that some disposition would have to
be made of the land, and the power given to the ap-
pellant to sell and convey it was therefore also germane
to the subject. The vice of this objection is that the
*subject* of the statute is confounded with the mere details
or interdependent acts prescribed by the statute, and
authorized to be done in carrying into effect the subject-
matter itself. The title, whilst it must indicate the
subject, need not give an abstract of the contents of the
Act; nor need it mention the means and method by
which the general purpose is to be accomplished. There
is no foreign, irrelevant, or discordant matter incorpo-
rated in the statute. *Davis vs. The State,* 7 *Md.,* 151;
*Keller, et al. vs. The State,* 11 *Md.,* 531; *Parkinson vs.
The State,* 14 *Md.,* 184; *Mayor, &c. of Baltimore vs. Reitz,*
50 *Md.,* 579; *State vs. Norris, et al.,* 70 *Md.,* 91.

It follows, from the views we have expressed that the
appellant can sell and convey the property described in
the Elder deed of 1815 and in the Smith deed of 1841.
A decree will, therefore, be signed reversing the *pro
forma* decree of Circuit Court No. 2 and remanding the

cause for further proceedings in conformity with this opinion.

> *Pro forma decree reversed,*
> *and cause remanded.*