# THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *vs.* FRANK H. FLACK ET AL.

*Title of Act Sufficiently Describing Subject-Matter—Construction of Act of 1904, ch. 274, Relating to the Paving of Streets in the Annexed Portion of Baltimore City—Alternative Method of Appointing Commission to do the Paving—Power of Commission to Designate Streets to be Paved and to Select Material—Conflict Between Municipal Ordinances and Act of Assembly—Provision of City Charter Requiring Contracts to be Awarded to Lowest Bidder—Competition Between Different Kinds of Materials for Paving According to Different Specifications—Kind of Material May be Selected After Receipt of Bids—Award of Contract to One Not Lowest Bidder of All Kinds—Award of Contract for Patented Process.*

Under Constitution, Art. 3, sec. 29, which prescribes that every law enacted by the General Assembly shall be described in its title, it is not necessary that the details of the legislation and the means by which its object is to be effectuated shall be described in the title.

The title of the Act of 1904, ch. 274, set forth that it was an Act to authorize the Mayor and City Council of Baltimore to provide a certain sum of money to pay for opening, grading and paving streets in the annex portion of the city, and to authorize the appointment of a commission to be known as the Annex Improvement Commission and to define the duties of that commission. Earlier sections of the Act provided for a certain method of appointing the commission and defined its duties. A subsequent section directed that in lieu of said commission, the Mayor and City Council may by ordinance empower the Commissioners for Opening Streets to perform the duties imposed on said commission. Such an ordinance was passed by the municipality. *Held*, that the Act does not violate Constitution, Art. 3, sec. 29, under which the subject of every law must be described in its title, since the subject of the Act is the authority to grade and pave the streets in question, the manner of doing that being a mere matter of detail, and as the method of appointing the commission was not specified in the title, it was competent to provide in the body of the Act for alternative modes of appointment.

The Act of 1904, ch. 274, relating exclusively to the paving and grading of streets in the annex portion of Baltimore City, provided for the appointment of a special commission with full power to do the work, and also that the Mayor and City Council might in the alternative empower the regular Commissioners for Opening Streets to perform the duties of said commission   *Held*, that the Act provided for a system of grad-

ing and paving these streets distinct from the system provided by ordi-
nance for grading and paving streets in other parts of the city; that the
Legislature had the power to establish such distinct system, and that
when by ordinance the municipality directed the work to be done by
the Commissioners for Opening Streets these thereby became vested
with the powers conferred by the Act on the Annex Improvement
Commission.

The said Act declared that the commission shall have the right and power
to grade and pave any street in the annex portion of the city and shall
have all the powers necessary and proper in the exercise of said power.
*Held*, that the commission had the right to designate which streets in
the annex should be paved and to select the materials with which the
paving should be done, and it was not necessary for the City Council
to designate previously the streets to be paved, since full power to pave
any street does not mean power to pave only such streets as the Coun-
cil may name.

An ordinance of the Mayor and City Council authorized the Commis-
sioners for Opening Streets to perform the duties prescribed in the Act
of 1904, ch. 274, for the Annex Improvement Commission and directed
in one of its sections that in grading and paving streets in the annex
the procedure of said commissioners shall be that now or hereafter
prescribed by law in relation to the duties of the same nature with
which the City Engineer and other officers of the city are clothed.
Some of the existing ordinances related to the paving of newly opened
streets and to the repaving with improved pavements of streets when
an ordinance providing for such repaving does not prescribe the kind
to be used. *Held*, that these provisions have no application to the
paving of an existing street in the annex and one in regard to which no
ordinance had been passed.

*Held*, further, that the provision directing the commissioners to pave the
streets in the annex in the manner prescribed by existing ordinances
for similar work in the city is invalid in so far as any of the existing
ordinances are in conflict with the Act of 1904, since the Mayor and
City Council could not restrict by ordinance any of the powers con-
ferred on the Annex Commission by the Act of 1904.

Sections 14 and 15 of the Baltimore City Charter, Act of 1898, ch. 123,
direct that in contracting for any public work or purchase of supplies
by any of the city departments or special commissions proposals for
the same shall first be advertised for and that the Board of Awards
shall after opening the bids award the contract to the lowest responsi-
ble bidder. Certain commissioners acting as the Annex Improvement
Commission under the Act of 1904, ch. 274, which gave them full
power to pave the streets in the annex portion of the city, prepared
three sets of specifications for the paving of a certain street in the
annex. One set was for asphalt block, the second for vitrified brick,
and the third for bitulithic pavement. The last named was a patented

process and the specification for it was accompanied by an agreement of the owner of the patent allowing its use by anyone for a designated price.   After advertisement two bids were submitted on vitrified brick, one on asphalt and three on bitulithic.   The commissioners selected the lowest responsible bidder on bitulithic pavement, although one of the bids on vitrified brick was for a lesser sum per square yard, and the Board of Awards awarded the contract to said bidder on bitulithic. *Held,* that this method of procedure was not in violation of secs. 14 and 15 of the Charter, since it was not necessary that the selection of the kind of pavement to be laid should be made in advance of the time of asking for bids, and the commissioners had the power either to select the kind of pavement before calling for bids or after the receipt of bids upon distinct sets of specifications descriptive of different kinds of pavements all suited to the same general purpose.

*Held,* further, that sections 14 and 15 of the Charter do not relate to a competition between different kinds of materials with which a street may be paved, but they apply only to a competition in price; they apply to the lowest responsible bidder and not to the lowest priced and least suitable material.

When a municipal charter requires that the contract for paving a street be awarded to the lowest responsible bidder and a board is authorized to choose the kind of material to be used, the board is not required to select in advance the particular kind of material to be used and ask only for bids on that.  Two kinds of competition are lawful, the one competition between different materials which will equally answer the same general purpose, and the other competition between the prices bid respectively upon each of the distinct materials.

And the board is authorized to award the contract to the lowest responsible bidder on a particular kind of paving, although the bid on another kind may be lower in price.   In such case the board judges which of the materials is more suitable for the locality.

When the charter requires that municipal contracts be awarded to the lowest responsible bidder the municipality is not prohibited from purchasing or specifying a patented article or process, at least when there is a stipulation that the patentee would allow the use of his patent and superintend the work in consideration of a specified sum to be paid him by whoever secured the contract.

*Decided per curiam August 9th, 1906; the following opinion was filed October 4th, 1906.*

Appeal from the Circuit Court of Baltimore City (Stock-bridge, J.)

The cause was argued before McSherry, C. J., Briscoe, Boyd, Pearce, Schmucker, Jones and Burke, JJ.

*W. Cabell Bruce* and *Albert C. Ritchie* (with whom was *Sylvan Hays Lauchheimer* on the brief), for the Mayor and City Council of Baltimore *et al.*, appellants.

*James M. Head*, for Warren Bros. Co., appellants.

*Isaac Lobe Strauss,* for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

In 1904 the General Assembly of Maryland adopted an Act known as Chapter 274. The title of that Act is in the words following:

"An Act to authorize the Mayor and City Council of Baltimore to issue its certificate of stock to an amount not exceeding two million dollars for the purpose of providing the money to pay the costs and expenses of condemning, opening, grading, paving and curbing the streets, avenues, lanes and alleys of the annex portion of Baltimore City; and to authorize the appointment of a commission, to be known as the 'Annex Improvement Commission,' and to define the duties of said commission." Section one provides for the issue of certificates of city stock to the extent of two millions of dollars, out of the proceeds of which are to be defrayed the costs and expenses incurred in "condemning, opening, grading, paving and curbing the streets, avenues, lanes and alleys of the annex portion of Baltimore City." By section two the Mayor of Baltimore City is authorized to appoint four persons who with certain designated city officials were to constitute a commission to be known as the "Annex Improvement Commission," and the duties of that commission, in so far as they concern the pending litigation, are defined in sections three, five and seven of the statute. Section three enacts, "That said Commission shall have the right and power to condemn, lay out, open, extend, widen, straighten, close, grade and pave any street, avenue, lane, or alley or any part thereof, from curb to curb; and to establish and fix the building line and the width of the sidewalks on any street, avenue, lane or alley now existing or to be laid out, opened, extended, widened,

straightened, graded or paved in the annex portion of the city of Baltimore.  That said commission shall have full powers necessary and proper in the exercise of said powers; and the Mayor and City Council of Baltimore are hereby authorized and empowered to grant by ordinance any further powers and duties it shall deem necessary for the proper execution of the improvements intended to be made by this Act."  Section five constitutes the commission the agent of the Mayor and City Council for the acquisition of property required to open, widen   *   *   *   grade or pave any street; whilst section seven authorizes and empowers the commission to contract with any person, company or corporation for the work of opening, grading, curbing and paving the streets, avenues, lanes and alleys of the annex as intended by the Act, or to employ the necessary laborers, help and assistance, skilled and unskilled, and perform the work under their own supervision.  Section ten, which is especially assailed in these proceedings, is in these words:  "Provided, however, in lieu of said commission hereinbefore provided for in section 2 of this Act, the Mayor and City Council may by ordinance authorize and empower the Commissioners for Opening Streets of Baltimore City to perform the duties and functions in this bill heretofore provided for the said commission."

This Act gives rise to some of the questions with which we are required to deal, and they will be stated and discussed later on.

In execution of the power conferred on the city by the above-mentioned Act of Assembly, the Mayor and City Council adopted an ordinance known as Ordinance No. 216, approved March 6th, 1905.  By that ordinance sundry provisions were made, but we are concerned only with those contained in sections six and seven.  By section six it was ordained by the Mayor and City Council of Baltimore: "Pursuant to the powers conferred upon it by sec. 10 of ch. 274 of the Acts of the General Assembly of Maryland in the year 1904, that the Commissioners for Opening Streets be and they are hereby authorized and empowered and directed,   *   *   *

to perform the duties and functions in said Act provided for the Annex Improvement Commission." Section seven, amongst other things declares, "that in grading, paving and curbing streets, avenues, lanes, alleys, or parts therof * * * the proceedure of said Commissioners for Opening Streets shall be that now or hereafter prescribed by law in relation to the respective duties and powers of the same nature with which the City Engineer and other officers of the city are now respectively clothed." These two sections of the ordinance are alleged to be invalid; and they give rise to some of the other questions involved.

Acting under ch. 274 and Ordinance 216 the Commissioners for Opening Streets advertised in the month of April, 1906, for separate sealed proposals to be addressed to the Board of Awards, to curb, gutter and pave with asphalt block, bitulithic or vitrified brick pavement, Twenty-fifth street from the York Turnpike Road to Oak street, in accordance with separate specifications, plans and profiles drawn for each of the three kinds of pavement, and then on file in the office of the Commissioners for Opening Streets. Twenty-fifth street is in the annex portion of Baltimore City. Bids were submitted by different parties for doing the work with each of the specified materials. When the bids were opened the bid of the Barber Asphalt Paving Company was rejected because it was not framed in accordance with the prescribed specifications, and thereupon the Commissioners for Opening Streets selected bitulithic as the material with which the paving was to be done; and then the Board of Awards awarded the contract to Warren Brothers Company at the price of two dollars and eighteen cents per square yard of bitulithic pavement, that being the lowest price bid on that material, although the lowest price bid on vitrified brick was two dollars and nine cents per square yard. The bid on the asphalt block pavement was two dollars and sixty-five cents per square yard. A contract was then entered into between the Warren Brothers Company and the city for the laying of a bitulithic pavement on the street named at the price bid by that company. After

the work under the contract had been commenced two bills in equity were filed in the Circuit Court of Baltimore City by certain taxpayers of the city to procure a decree annulling the contract which had been entered into, and to obtain an injunction restraining the city, its officers and agents and the Warren Brothers Company from proceeding to lay the pavement under the contract. Both of those bills attacked the constitutionality of the Act of 1904, and assailed the validity of secs. 6 and 7 of Ordinance No. 216. The bills also, by way of an alternative ground of relief, asserted that under *secs. 14 and 15* of the Charter of Baltimore City which will be fully stated later on (Act of 1898, ch. 123), the commissioners had no authority to put different paving materials in competition with each other and no power after the bids on those materials had been opened, to select one of those materials for the paving, unless they selected the one upon which the lowest price of all the prices submitted, was bid. The Circuit Court upheld the Act of 1904 and Ordinance 216 but decided that secs. 14 and 15, of the City Charter had not been complied with in awarding the contract, and, consequently, decreed that the contract with the Warren Brothers Company was invalid because their's was not the lowest of *all* the submitted bids. An injunction restraining the prosecution of the work under that contract was issued; and the work was arrested and the city and the Warren Brothers Company appealed. Owing to the fact that Twenty-fifth street had been torn up before the injunctions were granted and was in an almost impassable condition on that account; and to the further fact that a delay in hearing the cases on appeal until the beginning of the October Term of this Court would most probably have suspended all paving operations in the Annex until the spring of 1907, this Court assembled in special session at the request of all the litigants on the eighth of August last and heard these and one other paving cases. A decree was signed the following day reversing the decree appealed against, the injunctions were dissolved and the bills of complaint were dismissed. We now

proceed to give our reasons in support of the conclusions which were briefly announced on August the ninth.

: There are three distinct groups of questions presented by the record; and these are: First, those which relate to the Act of 1904; secondly, those which concern Ordinance No. 216; thirdly, those with respect to which secs. 14 and 15 of the City Charter have been applied by the Circuit Court. Each of these groups comprehends several distinct inquiries which will be separately considered and determined in so far as that is practicable.

*First*. Let us now turn to the Act of 1904, ch. 274.

(*a*) Is it invalid because in conflict with secs. 29, Art. 3 of the State Constitution as contended by the appellees? (*b*) If not invalid, what is its scope and what is the extent of the powers which it confers?

(*a*) The specific proposition advanced by the assailants of the Act of 1904 is this: That section *ten* of the Act is not described in, but conflicts with the title of the Act, and is therefore void under Art. 3, sec. 29 of the Constitution. By the constitutional provision just mentioned it is declared: "Every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." This declaration of the organic law has been before the Court of Appeals in no fewer than forty-five cases since its incorporation into the Constitution of 1851; and in less than one-fourth of those instances has an Act of Assembly been stricken down by reason of its being in conflict with that provision. It is only the *subject* to the Act which must be described in the title, and neither the details of the legislation nor the means or instrumentalities by which the subject is to be carried into effect constitute the *subject* of the Act. The title of the Act of 1904 describes the subject of the Act to be an authority given to the city to raise a sum of money with which to pay the costs of condemning, opening, grading, paving and curbing the streets, avenues, lanes and alleys of the annex, including an authority to appoint a commission to be known as the "Annex Improvement Commission," whose

duties were to be defined in the Act.    Neither the details with respect to the method to be followed to raise the two millions of dollars named in the title; nor the details with relation to the appointment, the number, the qualifications or the personnel of the commissioners; nor the details concerning their duties were stated in the title or were required to be set forth therein.    The *authority* to do the things indicated, is the subject of the Act, whilst the *manner* of doing those things is not attempted to be specified in the title and would have been wholly out of place if it had been; since the *manner* of doing them is a mere matter of detail concerning, not the subject itself which is the *authority* to do the things, but the method of exercising that authority.    Undoubtedly under the title the appointment of a commission, to be known as the Annex Improvement Commission, was provided for, but there is not a word in the title to indicate that the Act prescribed a particular method of appointment or designated particular individuals to compose the commission to the exclusion of some other method or some other individuals; and that being so, there is nothing in the title to indicate that the body of the Act might not contain alternative methods of appointment, or might not include provisions permitting some existing municipal board to act as such Annex Improvement Commission.    The tenth section of the Act of 1904, which has been quoted hereinbefore, provides an alternative method differing from that prescribed in the second section.    If the second section had been omitted from the Act, and if so much of the tenth had been inserted in its place as was required to constitute the Commissioners for Opening Streets the Annex Improvement Commission, can it be pretended that the body of the Act would have been in conflict with or would not have been covered by the title?    And so, if the tenth section had not been incorporated in the Act, no one would venture to suggest a doubt as to the Act and the title being harmonious.    The reason why in each of the supposed instances the Act would have been free from the objection of being in conflict with sec. 29 of Art. 3 of the Constitution is, that the title is sufficiently broad and un-

restricted to include either the one or the other of the two methods of appointment, and as neither was specified in the title either could have been inserted in the body of the Act. It is precisely because either of the two methods could have been validly prescribed in the body of the Act under the title, that *both*—the one as the alternative of the other—would be likewise strictly in consonance with the same title. As there is no restriction in the title as to the method of making the appointments or as to the personnel of the commission to be appointed, the General Assembly was at perfect liberty to prescribe in the body of the Act any method it pleased, including alternative methods.

Our predecessors had occasion to interpret this constitutional provision for the first time in *Davis* v. *The State*, 7 Md. 161, and in the course of their judgment they used this apposite language: "The object of this constitutional provision is obvious and highly commendable. A practice had crept into our system of legislation, of engrafting upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing new strength for it, members were often induced to sanction and actually vote for such provisions, which if they were offered as independent subjects, would never have received their support. In this way the people of our State, have been frequently inflicted with evil and injurious legislation. Besides, foreign matter has often been stealthily incorporated into law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments that few of the members of the Legislature knew anything of before. To remedy such and similar evils, was this provision inserted in the Constitution, and we think wisely inserted." This exposition of the object of the constitutional provision delivered three years after the adoption of that provision, was followed less than five years later by the decision in *Parkinson* v. *The State*, 14 Md. 184, wherein

the distinction was pointed out between *subject* of a penal en-
actment—which must be stated in the title—and the *means* by
which the legislative intention was to be accomplished—which
need *not* be described in the title.   The case arose on an in-
dictment which charged the traverser with having *given* to a
minor certain fermented liquor in violaton of the provisions of
the Act of 1858, ch. 55.   The title of that Act was: "An Act
to prohibit the sale of intoxicating liquors in the city of An-
napolis, or within five miles thereof, to minors and people of
color;" and the body of the Act made it unlawful for any per-
son "to sell, dispose of, barter or give" any spirituous or fer-
mented liquors to any youth or minor without the written
order of the parents and guardians of such minor.   The con-
tention was that as the title was restricted to the *sale* of liquors
the provision in the body of the statute prohibiting the giving
of liquors was not included in the title and was therefore void.
But the Court held that it was the manifest intention of the
legislation to prohibit or restrain minors and people of color
from obtaining intoxicating liquors—that was the *subject* of
the law.   "Prohibiting the sale of it to them," said the Court,
"is only *one* of the means by which the chief intention of the
Legislature was to be accomplished.   Employing other means,
designed to effect the same purpose, cannot be properly con-
sidered the introduction of another or different subject, within
the meaning of the constitutional restriction.   If it were so,
no law providing several modes for effecting its main purpose,
would be valid in all its provisions."

When the cases in which it has been held that legislation
was invalid, because in conflict with sec. 29 of Art. 3 of the
Constitution, are examined, it will be found, either that some-
thing wholly repugnant to the title, or something altogether for-
eign to the subject described in the title had been attempted
to be incorporated in the body of the Act, in flagrant disregard
of the principle announced in *Davis* v. *The State*, *supra*.   For
example: In *Steifel et al.* v. *Md. Ins.*, *&c.*, 61 Md. 144, *affirm-*
*ative* legislation was attempted under a title which disclosed
absolutely nothing except the repeal of a former Act.   The

same condition was presented in *The State* v. *Benzinger*, 83 Md. 481.    Another instance of the insertion in the body of the Act of provisions wholly repugnant to the title is, *Whitman* v. *The State*, 80 Md. 410, where the title purported to *regulate* the sale of liquor and the enactment *prohibited* the sale.   There are several cases which illustrate the vice of incorporating in the Act something altogether foreign to the subject described in the title.    Thus in *Scharf* v. *Tasker*, 73 Md. 378, under a title to provide for the assessment of the unclaimed military lots in Allegany and Garrett Counties, a section of the Act which exempted Garrett County from the obligation of paying fees to the Commissioner of the Land Office then due for searches previously made, was stricken down.    And in *State* v. *Schultz Co.*, 83 Md. 58, the title had relation to *newly* incorporated companies, whilst the Act included *existing* companies.    In *Luman* v. *Hitchins Bros.*, 90 Md. 15, the title prohibited sales to *employes*, whilst the Act prohibited sales to *anyone*.

These and all the cases on this subject in our Reports show that this Court-has never leaned towards a narrow interpretation of sec. 29, Art. 3 of the Constitution and we are unwilling now after the lapse of more than half a century since the decision of *Davis* v. *The State*, to bring, by a strained construction, under the penalty of its prohibition, statutes which are not within the obvious evils and mischiefs that its adoption as a part of the organic law was designed to obviate. Looking, as we must, to the object which the framers of the Constitution and the people who ratified it had in view when the clause in question was adopted, we have no hesitation in holding that section ten of ch. 274 of the. Acts of 1904 is valid and that the attack made upon its constitutionalty cannot be permitted to prevail.    We have gone much more extensively into a consideration of this branch of the case than ordinarily would be deemed necessary; and we have done so, not because we entertain the faintest doubt as to the correctness of the conclusion which we reached and announced in respect to the constitutionality of section ten after the close of

the argument, but because the learned counsel of the appellees placed such great reliance on this objection to its validity in his admirable, exhaustive and exceedingly able presentation of the case.

(*b*) The Act of 1904 being free from any constitutional infirmity, what is its scope and what is the extent of the powers which it confers?   It must be remembered that it relates to condemning, opening, grading, paving and curbing of the streets avenues, lanes and alleys situated exclusively in the *annex portion of Baltimore City;* and it is perfectly obvious that it was designed to establish a radically different system for that locality from the one which was provided in the City Charter and the city ordinances for the doing of similar work within the original city limits.   The General Assembly had the power to adopt such an enactment, since its legislative authority is supreme, unless restricted by the Constitution; and no restriction can be found in the organic law which would inhibit the passage of that statute.   The reasons and the motives which influenced the Legislature to create, for the annex, this independent system are not material.   The only inquiries with which the Courts are concerned are:   Was a separate and distinct system provided?   Had the Legislature the power to establish it?   What is the scope and what are the details of that system?   A mere glance at the title of the Act of 1904 and at such of its provisions as have been hereinbefore alluded to, is all that is needed to furnish an affirmative answer to the first of these three inquiries.   If the Legislature had intended that the paving in the annex should be done in accordance with the requirements of the City Charter and under the city ordinances relating to paving within the original city limits, there would have been no occasion, whatever, to establish an Annex Improvement Commission and to clothe it with the powers and to entrust it with the duties which the Act of 1904 confers and imposes upon that commission; and nothing further would have been necessary than the adoption of an Act authorizing the issue of the city's obligation with which to raise the funds needed to pay for the

work. No one, we imagine, would venture to suggest, much less to assert, that the Legislature did not possess the *power* to adopt the statute in question; and we, therefore, approach the consideration of the scope and the details of the special system created by the Act of 1904.

Whilst the Act of 1904, ch. 274, deals with but one subject which is accurately described in its title, its various sections, all looking to the accomplishments of the single purpose with which the Act is concerned, may be classified as follows: First, those which relate to the issue and sale of city stock to procure the funds with which the work is to be paid for; secondly, those which provide for the formation of the Annex Improvement Commission; and thirdly, those which define the powers and duties of that commission. The first of those classes is not involved in this controversy. The second comprising the second and tenth sections, has to some extent been adverted to already and but a few words more will be needed in disposing of it. Under those sections the Mayor and City Council was given the power to constitute the Annex Improvement Commission in one or the other of two alternative ways, and the commission itself was to consist of more or less members as the one or the other of the two sections might be followed. By section two the commission was to be made up of ten members—four of whom were to be appointed by the Mayor subject to confirmation by the Second Branch of the Council (Art. 4, sec. 25, Local Code),—and the remaining six were to be the city officials named in the section. In lieu of the commission contemplated by section two, the Mayor and City Council were authorized, under section ten, to empower by ordinance the Commissioners for Opening Streets who are three in number to perform the duties and functions of the commission provided for in section two. Sec. 6 of Ordinance 216 expressly conferred upon the Commissioners for Opening Streets all the duties, powers and functions provided in the Act of 1904 for the commission contemplated by sec. 2. The Mayor and City Council by that ordinance exercised the discretion given by the statute and thereupon the Commissioners for

Opening Streets became, in virtue of sec. 10 of the Act of 1904 and of sec. 6 of Ordinance No. 216, *the* Annex Improvement Commission.    What, then, are the powers of that commission thus constituted, with respect to the grading and paving of streets in the annex?    The charter of the city need not be looked to for an answer to that question, because the Act of 1904 is the sole source of those powers.    The power derived from the Act by the commission as it now exists are not trammelled by or subordinate to any provision of the City Charter; they are sweeping and unrestricted and pertain exclusively to a newly created and wholly independent agency of the city except in so far as secs. 14 and 15 of the charter put limits to the exercise of those powers if they put limits thereto at all.    The "said commission shall have the *right* and *power* * * * to grade and pave any street, lane or alley * * * in the annex portion of the city of Baltimore;" and it "shall have all powers necessary and proper in the exercise of said powers."    These are the words of section three.    The powers thus given are broad and unqualified.    There is no condition annexed, either express or implied, indicating that the power to grade and pave can only be exercised *after* the City Council shall designate which streets are to be paved; nor is there a single imperative duty imposed by the Act upon the Mayor and City Council in respect to the work on the streets in the annex, save that prescribed by sec. 8.    That section enacts, "that the Mayor and City Council shall prescribe by ordinance the methods and proceedings for the *sewerage* and *drainage* of said annex."    The specific assignment of that duty and no other to the municipality is tantamount to a denial to other officials of any power in the premises, especially in view of the explicit declaration that the commission "shall have all powers necessary and proper in the exercise" of "the right and power" to grade and pave *any* street in the annex.    The power to designate which streets in the annex shall be paved and to select the materials with which the paving shall be done is obviously included in the broader unlimited power to pave any street.    If the commission may pave *any* street in the annex,

and if in addition to that power it possesses all necessary and proper powers for the exercise of *that* power, it must undoubtedly be clothed with the further power to decide *which* of the streets are to be paved; because until it is determined *which* streets are to be paved it would be impossible to pave *any* street, since the selection of the street to be paved must necessarily precede the actual paving, and no one else is entrusted with the authority to determine which streets are to be paved. The grant of a power to pave *any* street in the annex, coupled with the additional grant of *all* powers necessary and proper to the exercise of the primary power, is a grant of *full* power to do the thing specified, as the agency clothed with the power to do it may, in its discretion determine. We do not understand how the commission can possess *full* power to pave *any* street in the annex, if it can only pave *such* streets therein as the Mayor and City Council shall by ordinance previously designate. Full power does not mean conditional power. Full power to pave *any* street does not mean power to pave only *such* streets as the council may name; because, in the event that it did mean that, if the council neglected or refused to select the streets to be paved, the power of the commission to pave any street would be abrogated and the whole scheme of the legislation would be thwarted. If the term full power were construed to be synonymous with limited or conditional power, then the plenary power conferred by the statute upon an independent agency would be narrowed down to a restricted power to be exercised in subordination to the judgment of some other agency, though not a word in the statute justifies the implication that such was the legislative intention. The conclusion that the Annex Improvement Commission is alone entrusted with the power to select the streets to be paved in the annex is strengthened by the provisions of section seven of the Act of 1904, for by those provisions the commission is authorized to contract with any person to do the work of paving the streets of the annex—not the streets which the City Council may name—but the streets, that is all the streets, and of cours,

therefore, *any* of them; or, the commission may employ labor-
ers to do the work under its supervision.   There is no more
authority in the Mayor and City Council to select the streets
to be paved than there is in the city government to determine
whether the work thereon shall be done by contract or by day
labor.   As the proceeds of the two million loan were to be
applied exclusively to defray the cost and expense of con-
demning, laying out, opening, extending, widening, straight-
ening, closing, grading and paving the stre sts, avenues, lanes
and alleys in the annex; and as by one of the provisos in the
first section of the Act not more than five hundred thousand
dollars, or one-fourth, of the city stock to be issued for those
purposes, can be disposed of in any one year; it is apparent
that the Legislature contemplated that the commission should
do only *part* of the work of paving each year; and inasmuch
as to no other department or agency of the city government
was there delegated any authority to determine *what* part
should be paved in any of the four years over which the work
was required to extend, it must inevitably follow that to the
commission, and to it alone, was committed the authority and
the discretion to select, in the exercise of the broad powers
entrusted to it, the streets to be paved each year.   With the
deliberate and honest exercise of that discretion no other tri-
bunal can lawfully interfere.   What has been said in regard to
the selection of the streets to be paved applies equally to the
choice of the material to be used in doing the work and as to
the mode and method in which it may be done.   *McQuillan,*
*Mun. Ord.*, sec. 519.   Holding as we do that the Commission-
ers for Opening Streets (acting as and in reality constituting
under sec. 1c of the Act of 1904 and under sec. 6 of Ordinance
No. 216, the Annex Improvement Commission) possess the
powers which have just been indicated, we come to the second
group of questions involved in the case, and they are those
which arise under Ordinance No. 216.

*Secondly.* Sections six and seven of Ordinance No. 216 are
alleged in the bills of complaint to be "unauthorized, null and
void," and the ground upon which that allegation is founded

is the asserted unconstitutionality of sec. 10 of the Act of
1904. As we have in an earlier part of this judgment de-
cided that the Act of 1904 is constitutional and valid through-
out all of its provisions, nothing more need be said upon that
subject. ' The power to adopt sec. 6 of the ordinance was
expressly conferred on the Mayor and City Council by *sec. 10*
of the Act of 1904 aud the power has been exercised in
almost the exact language in which it was granted. With
respect to section seven of Ordinance No. 216 an alternative
contention is presented in the seventh paragraph of the bills
of complaint. After charging in the sixth paragraph that
both *secs. 6 and 7* are "unauthorized, null and void," it is
assumed for the purposes of the position taken in paragraph
seven that section seven of the ordinance is *not* unauthorized,
null and void; and upon the basis of that assumption the
same seventh section of the ordinance is relied on to restrict
and curtail the power of the Annex Improvement Commission.
Of course if *sec. 7* of the ordinance is invalid, for any reason,
it can impose no restriction at all on the Annex Improvement
Commission, and if on the other hand it is valid, then the
question as to whether it circumscribes the authority of the
commission depends on the provisions of the section and their
meaning. Sec. 7 of Ordinance No. 216 is not invalid on the
ground averred in the bills of complaint, viz., the alleged un-
constitutionality of sec. 10 of the Act of 1904, because that
section of the Act is not void, but there is another and a dif-
ferent reason which if sustained might strike down sec. 7, as
we shall presently see. But before touching upon that rea-
son it will be necessary to understand clearly what is the con-
tention of the appellees, and what is the precise meaning of
sec. 7. By that section it is ordained, as had been stated,
that in grading and paving streets under the Act of 1904 the
*procedure* of the said commissioners shall be that now or here-
after prescribed by law in relation to the respective duties and
powers of the same nature with which the City Engineer and
other officers of the city are respectively clothed. Now Ordi-
nance No. 165, approved February 24th, 1899, prescribes a

procedure which must be observed by the City Commissioner in paving streets, and it is insisted that the procedure there provided is the one which must be followed by the Annex Commission in obedience to *sec. 7* of Ordinance No. 216, since the duties of the City Commissioner are now by the City Charter (*sec. 86, ch. 123, Acts 1898*), devolved upon the City Engineer. We do not think Ordinance No. 165 has any application to these cases, and the reasons for that conclusion are obvious, when the provisions of the ordinance are examined. Without quoting them at length it suffices to say that the second section relates only to the paving of a newly opened street, avenue, lane or alley within the city limits," and as Twenty-fifth street is not a "newly opened street" the procedure prescribed with respect to a "newly opened street" has manifestly no application. The third section defines the term "improved pavements." Section four ordains "that in all cases of repaving, with improved pavement," streets already paved "where an ordinance providing for such repaving does not specify the kind of improved pavement to be used for such repaving * * * then the kind of improved pavement to be used for such repaving shall be decided upon by the City Commissioner, with the approval of the Mayor." This section does not apply because no ordinance was ever passed directing Twenty-fiith street to be *repaved* and the section relates to repaving. Sec. 6 refers to macadamizing as contradistinguished from paving. This brief analysis of Ordinance No. 165 is quite sufficient to show that its provisions have no application to Twenty-fifth street, and therefore they cannot limit the powers which the Act of 1904 and sec. 6 of Ordinance No. 216 confer upon the Annex Commission in the premises.

But if this were not so, and if the contention were sound that Ordinance No. 165 conflicts with the Act of 1904 and tended to limit its scope, then it would follow that sec. 7 of Ordinance No. 216 is so far as it by its general reference to then existing laws incorporated Ordinance No. 165, would be invalid. And it would be invalid, not because sec. 10 of the

Act of 1904 was unconstitutional, but because the Mayor and
City Council was incompetent to restrict or qualify, by ordi-
nance, any of the powers conferred on the Annex Commission
by the Act of 1904.   It is an elementary principle that since
all of the powers of a municipal corporation are derived from
the law and its charter, no ordinance or by-law can enlarge,
diminish, or vary its powers.   I *Dillon, Mun. Cor.,* sec. 251;
*Thompson* v. *Carroll,* 22 How. 422.   We do not think that
sec. 7 imports into Ordinance No. 216 any municipal legisla-
tion which is hostile to the Act of 1904.   Hence in both of
the alternative contingencies relied on in the bills of complaint
to deprive the Annex Commission of the power to act in the
way it did proceed in the matter of Twenty-fifth street, the
appellees have failed to sustain their contention, and the au-
thority given to the commission by the Act of 1904 may be
lawfully exercised by it.

*Thirdly.* We now come to the questions which arise under
*secs. 14 and 15* of the City Charter, and those questions are
several in number—of which the most important concerns the
method adopted to secure competitive bidding.   Assuming
that *secs. 14 and 15* of the City Charter are applicable to the
Annex Improvement Commission as alleged in the bills of
complaint, in spite of the provisions of the Act of 1904, ch.
274, we proceed to inquire whether those sections have been
disregarded or complied with.   We start now with the above
assumption as a postulate, both because the pleadings are
framed upon that theory and because in a case immediately
following these—that of the *Mayor and City Council* v. *Gahan*
—the precise inquiry as to whether those sections prohibit the
kind of competitive bidding called for in these cases, is dis-
tinctly raised and essentially involved, and the legality of and
the objections to the system adopted may as well be disposed
of at once, and thereby a separate discussion of this subject
in Gahan's case will be avoided.

Sec. 14 provides that "Hereafter in contracting for any pub-
lic work or purchase of any supplies or materials involving an
expenditure of five hundred dollars or more for the city, or

by any of the city departments  *  *  *  *or special commissions or boards,* unless· otherwise provided for in this Article, proposals for the same shall be first advertised for *  *  *  and the contract  *  *  *  shall be awarded by the board provided for in the next section of this Article, and in the mode and manner as therein prescribed." Sec. 15. "All bids made to the Mayor and City Council of Baltimore for supplies or work for any purpose whatsoever, unless otherwise provided in this Article," shall be opened by a board consisting of designated municipal officers and styled the Board of Awards, "which board or a majority of them, shall, after opening said bids, award the contract to the lowest responsible bidder." The Commissioners for Opening Streets, acting as the Annex Improvement Commission, prepared three separate and distinct sets of specifications, each exact and complete in itself. One set was for an asphalt block pavement, the second was for a vitrified brick pavement and the third was for a bitulithic pavement. The bitulithic pavement is a patented process. Accompanying and forming part of the specifications for the last-named pavement was an agreement signed by the Warren Brothers Company—the patentee and owner of the process used in laying bitulithic pavements— under and by which agreement the Warren Brothers Company stipulated and undertook to furnish to the city and to any individual who wished to bid on that kind of pavement, the patented wearing surface, the bituminous flush coating cement and chips, the bituminous cement for pouring the foundations and to supply an expert to give proper advice and to allow the use of the patents, all for the price of one dollar and forty-five cents per square yard of pavement. After due advertisements two bids were submitted on vitrified brick, one on asphalt block and three on bitulithic. The bid of the Barber Asphalt Company on bitulithic was rejected by the Board of Awards as has already been stated, because it did not even purport to conform to the specifications descriptive of that material, but was based upon different specifications prepared by that bidder, and which called for different materials, both stone and cement, which it

was claimed by the bidder would produce a pavement equally as good as the patented bitulithic. The board had the undoubted right to reject that bid. *People* v. *Board of Improvement*, 43 N. Y. 227. It described a pavement not specified at all. The remaining bids were then referred by the Board of Awards to the Commissioners for Opening Streets for comparison and tabulation. The last-named body at once held a meeting and selected the bitulithic as the material with which they desired Twenty-fifth street to be paved, and so notified the Board of Awards. Thereupon the Board of Awards reconvened and awarded the contract to the Warren Brothers Company, that company being the lowest responsible bidder for the construction of a bitulithic pavement in accordance with the prescribed specifications for such a pavement, though one of the bids on a vitrified brick pavement was lower than the bid of the Warren Brothers Company on bitulithic. As concisely stated in the City Solicitor's brief:

"Therefore, according to the method adopted for inviting bids and awarding the contracts, three different kinds of pavement were put in competition with each other, and after all the bids were opened, the commissioners selected the one of these pavements to be used, and the Board of Awards then awarded the contract to the lowest responsible bidder on the pavement so selected."

Thus competition was invited and secured both as to materials and as to price, and the contract was awarded to the lowest resposible bidder on the material selected, though there was another bidder whose price was lower on a different material. Was this method of procedure and this action in violation of *secs. 14 and 15* of the charter? There are two kinds of competition—the one, competition between different *things* which will equally answer the same general purpose; and the other, competition between the prices bid respectively upon *each* of those distinct things. When this general proposition is reduced to a concrete one and applied to the subject of paving a public street, it is perfectly obvious that there must be a selection by some one, at some time of some material, be-

fore any paving can be done.   Now, the choice of the paving material for a particular street, when the question is open as to what material ought to be used, of necessity involves an investigation into the qualities and adaptabilities of each of the suggested materials and the city officials who are charged with the duty of making the selection if they act honestly and are not bound by the preferences of property holders or by some positive enactment, must determine by the exercise of their judgment founded on comparison or observation, which of the materials is the more suitable for the locality; and one of the means by which that is accomplished is by putting the materials in competition with each other either publicly or privately.   This may be done before bids are asked; and when it is thus done it is done privately and nothing remains for competition except the *price* for which the work can be done with the selected materials.   But it does not follow that a selection of the kind of pavement must be made in advance of the time when the bids are called for.   The statute has lodged a wide discretion in the commission in this and in other particulars, and when in selecting materials that body has acted in good faith and its conduct is untainted with fraud or venality, no judicial tribunal is clothed with jurisdiction to re-judge its conclusions.   It cannot be successfully asserted, in view of the comprehensive powers given by the Act of 1904, that the Annex Commission is without authority to select the kind of pavement to be laid, or to select it before any bids are asked upon the specifications describing *that* kind of pavement.   What difference is there, or can there be—looking solely to the extent of that authority—between selecting the kind of pavement *before* bids are asked for, and selecting the kind of pavement after the bids have been received and opened, upon distinct sets of specifications descriptive of wholly different kinds of pavements, but all of which are suited to the same general purpose?   Manifestly, none whatever; though in some particulars not touching the power itself but affecting the ultimate result in other ways there may be a difference between the two methods.   Thus by the selection of

the materials, or the kind of pavement, *after* the bids have been received, combinations between bidders to inflate prices may be in a great measure avoided; since it is altogether improbable that parties who compete for the adoption of their respective materials will all ask exorbitant prices, as each party will, most likely, strive by depressing prices, to secure the contract. As in such an instance no bidder knows in advance which kind of pavement will be selected each is in reality, stimulated to propose terms which in order to secure him the contract, will produce the best results so far as the public are concerned. It is a matter of common knowledge that individuals and private corporations in developing and expanding their various business enterprises constantly resort to this system of duplex competition with most beneficial results; and it can scarcely be presumed that the Legislature, in adopting *secs. 14 and 15* of the charter, designed to deny to the city the facilities which individuals and private corporations avail of in prosecuting their divers activities. With the competition which relates exclusively to the *kind* of pavement the provisions of *secs. 14 and 15* have nothing to do, since they apply only to competition in price—they apply to the *lowest* responsible *bidder*, and not to the *lowest* priced and least suitable material. If this were not so there could be no selection of a material prior to the bids being called for, unless public competition as to the kind of material to be used were first invited and then the cheapest and perhaps most indifferent would have to be selected. The conclusion that *secs. 14 and 15* do not concern the selection of the kind of pavement, is not only sound *a priori*, but is sustained by the best considered cases, as will be seen in a moment. That such a method as that pursued in this instance may be open to the charge of being dominated by favoritism, or of being corruptly manipulated, may be true; but it is equally true, and much more likely, that both favoritism and fraud will control, if the material is secretly selected and the bids are confined to that one material, since, by inviting proposals for *one* particular thing or process, the public officials necessarily exclude *every-*

*thing else* which might have been substituted for the thing called for; and there is no clearer field for corruption and favoritism than in secretly shaping proposals, if in fact the city is in corrupt hands.    There is no pretence that fraud or corruption influenced the action of the Annex Commission, and the single question involved is one of *power* to do what was done and to do it in the manner in which it was done.    The Act of 1904 does not deny to the commission that power, but on the contrary, as we have seen, confers it; and *secs. 14 and 15* of the charter do not limit or circumscribe it.    Let us now turn to a few of the many cases on this subject.

The leading case is *Attorney-General, ex rel., Cook et al.* v. *City of Detroit*, 26 Mich. 263.    The charter of Detroit required contracts to be publicly let to the lowest responsible bidder. The facts, in general outline, "appear to be that the Common Council, having determined to cause St. Aubin avenue to be paved, instead of determining in advance what particular kind of pavement should be put down, and confining their invitation for proposals of that kind, caused specifications for each of several kinds of wood and stone pavement to be prepared and filed with the Comptroller, and then advertised that sealed proposals would be received during a time specified for paving said avenue with either wood or stone pavement, according to the specifications thus placed on file."    Separate specifications were prepared for the different kinds of pavements advertised for—as was done in the case at bar—and bids were submitted on each kind of pavement—as was also done in the instance now before us.    After the bids had been opened the council selected the Ballard pavement as the one to be used, although responsible parties had submitted lower bids upon some of the other kinds of pavements specified.    The lowest bid on the Ballard pavement was rejected because the bidder was not responsible, and to the next highest bidder on that character of pavement the contract was awarded.    JUDGE COOLEY in delivering the opinion of the Court thus states and discusses the question there presented, which is the identical one here involved.

"The first question involved in the merits of the suit is, whether the council was justified in proceeding in the manner mentioned to obtain proposals. It is insisted on behalf of the Attorney-General, that the kind of pavement to be put down should first be determined, and that bids should be called for and competition invited for that kind alone. It is denied that wood pavement can be put in competition with stone pavement, or that two kinds of wood pavement essentially different in construction and cost, can be included in the same notice which calls only for proposals for the paving of one street. The law, it is argued, intends that the bids shall settle the right to a contract on a mere inspection of the prices named; but if the bids are not to be all directed to the same specifications, they settle nothing, and it will always be in the power of the council to reject the lowest bid on the pretense that it is for an inferior pavement, whether such is the truth or not, and to accept the bid of a party they desire to favor, on the claim that, though his bid is higher, yet it is for a better pavement, and consequently such bid is, all things considered, the most for the interest of the city, and therefore, to be deemed the lowest." He then proceeds :

"It is not to be denied that there is a great deal of truth in this argument and if such a construction of the charter as the complainant contends for, will put it out of the power of the council to practice favortism in awarding contracts, it ought to be sustained as the one which the legislation must have intended. We are not aware, however, that it has ever been supposed that the provision of the charter now in question could have that highly desirable effect; on the contrary, it has often been observed that the most severe and stringent regulations of this nature may be administered dishonestly, though according to the strict letter of the law, so as not only to fail to give the proposed protection to the public, but on the other hand, so as to operate as if purposely devised to enable dishonest persons to plunder the public with impunity. The requirement that contracts shall be let to the lowest bidder, is in many cases, peculiarly susceptible to abuse. Its purpose

is, to secure competition among contractors for public works and supplies, and to give the public the benefit thereof. In some cases the most ample competition would be invited by presenting to bidders complete and particular specifications, which indicate the precise things wanted or which are to be done, and leave nothing to discretion or negotiation afterwards. But this could only be true where the case was such that many persons could bid for the work or materials, and would have a legal right to do one and furnish the other, and where the materials were not monopolized in single hands; but were readily obtainable from several sources. If a patented article were desired, which was owned by a single person who refused to sell the right to territory, or to fix a royalty, or if stone or any other material were required, and a single person owned all within a practical distance of the place where it was to be used, nothing could be more obvious than that the proposals which confined bids to the particular article or material, would invite no valuable competition, and that the protection of the public must lie in the power of the council to reject unreasonable offers. In such a case nothing is easier than for the council to obey strictly the letter of the law, and yet dishonestly and corruptly award the contract to one who is the lowest bidder for no other reason than because no one can bid against him, and who, having a practical monopoly, is allowed to fix his own terms. Now, if the purpose of the charter is to secure competition in work or supplies for the public, something is necessarily left to the discretion of the council; and they must determine in each case what competition the nature of the case will admit of, and what is the best method to secure it. If they invite proposals for a particular thing or process, they necessarily, in so doing, exclude everything else which might have been substituted for the thing called for. * * *

"The matter of paving affords an apt illustration of this truth. From the proposals before us it would be a reasonable inference that there are several patented wood pavements nearly equal in value and cost; but if the council call for proposals for one only, they necessarily exclude all the others; I

am aware of no legislation, and I can conceive of no process
by which they can be compelled always to make the selection
from public motives exclusively, if their disposition shall be
to do otherwise.     It would be worse than idle for the law to
mark out, or for the council to follow, any one unvarying
course in these cases."     And he further said:

"When bids are thus called for, all bidders for a particular
kind of pavement are bidders against all others in a certain
sense, but they are also bidders against each other in a more
particular sense.     It would be the duty of the council when
all bids are in to examine all and to select the kind of pave-
ment for which the bids, all things considered, were relatively
the lowest.  .  They might thus perhaps reject the kind they
would have preferred in advance, but for which they find all
bids exorbitant, and determine upon another because, in their
opinion, the offers made for it are more satisfactory.     But
when the kind is selected they have no discretion to be exer-
cised in a choice between responsible bidders.     The lowest
has an absolute right to the contract."

In the same case CHIEF JUDGE CHRISTIANCY delivering a
separate opinion said:

"When the pavement of a street is in contemplation, there
are two different kinds of competition which it is very desira-
ble to create among those who may wish to undertake the
work.     First, that between the *different kinds of pavement*, or
those prepared to engage in putting them down; second, that
between parties prepared to put down the *same kind*.

"The biddings referred to in the provision in question are
biddings for the *same particular kind* to be done according to
the same specifications.     And no bids for essentially different
kinds of work or pavements, and referring to different specifi-  .
cations, could be recognized as coming in competition with
each other for the purposes of determining the lowest bid,
within the requirements of this section, without opening the
door to the same corrupt combinations, and furnishing facili-
ties for the same fraudulent practices, which it was the pur-
pose of this provision to prevent.

"There is nothing, however, in the charter, which prevents the city from availing itself also, of the benefit of the other species of competition—that growing out of the different kinds of pavement seeking the public favor and adoption.

"And as the relative cost and value of the respective kinds would form a legitimate element of consideration, with the council in determining which kind to adopt for any particular street, a just regard for the public interest would certainly warrant, if it does not require some effort to secure this species of competition as well as that for any particular kind; and this would not only enable the council to form a more intelligent judgment in determining which kind it is best to adopt; but it incidentally tends also to induce fair and reasonable offers for each.

"It is, therefore, highly desirable that the council should have the benefit of this before entering upon the particular kind of pavement to be adopted.

"I see nothing in the charter to prevent this, or which requires the council to determine upon the kind which shall be adopted before proceeding to advertise for bids; since, if they thus previously determined and invited the bids only for the particular kind so decided upon, they would not be bound even to accept the lowest bid, but might then change their plan, or even determine not to pave the street.

"I, therefore, see no difficulty in securing both kinds of competition at the same time by preparing proposals, plans and specifications for each kind of pavement for which competition is to be invited, and combining the whole in one notice as was done in this case.

"The notice by referring to the respective specifications gave an equal opportunity to all persons, not only to enter into competition with those seeking to contract for any *other* kind, but also (within the letter and spirit of the charter), to compete with all who choose to bid for any *one particular kind.*

"But those bids only which had reference to the same particular kind, and to the same specifications, could be considered as competing bids, for the purpose of determining who was the lowest bidder within the meaning of the Charter."

JUDGE CHRISTINANCY'S opinion was approved in *Holmes* v. *Coun. Detroit*, 120 Mich. 226, s. c., 45 L. R. A. 121; and in *Fones Bros. Hardware Co.* v. *Erb*, 54 Ark. 645, s. c. 13 L. R. A. 353. In 2 *Page on Contracts sec.* 1048 the rule is thus stated: "If bids have been advertised for on two different specifications, intended as alternatives for the same work, a provision requiring the letting of the contract to the lowest bidder does not bind the city to select that specification on which the lowest bid is given;" citing *Trappe* v. *Newport*, 74 S. W. Rep. 1109 Ky.; *Trowbridge* v. *Hudson*, 24 Ohio, C. C. 76. How far if at all is this conclusion affected by the circumstance that one set of specifications includes or calls for the use of a patented article?

It must not be forgotten that every person who wished to bid on the specifications relating to a bitulithic pavement was entitled to use the Warren Brothers Company's patents and processes and to have the services of one of its superintendents at a price fixed before the bids were called for, which offer was open to acceptance by any bidder on that kind of pavement. In point of fact a bid was tendered on the basis of that offer and it was only seventeen cents per square yard higher than the Warren Brothers Company's own bid. Whilst the Courts of some of the States have held, upon grounds which do not seem to us to be satisfactory, that municipalities which are by their charters required to contract for materials, supplies and public works with the lowest and best, or the lowest responsible bidder, are prohibited from purchasing or specifying a patented or monopolistic article or process; there is practically a unanimity upon the proposition that a contract involving in its execution the use of a patented material or process, is not invalid when the contract for performing the work and furnishing the materials is let to the lowest bidder with the understanding that the patentee would allow the use of his patent and superintend its construction in consideration of a certain specified sum paid him by whoever secured the contract. Accordingly in *Kilvington* v. *City of Superior*, 83 Wis. 222, s. c., 18 L. R. A. 45, where the facts in this particular

were identical with those here disclosed, it was found by the Court that there was a definite, well-settled price for the patent and specifications, at which it was offered to the city and all contractors, which would limit the recovery of the patentee to that price, "so that in fact there was free competition for the work and material, and all else except the patent." And it was held that the city had the benefit of all the competition of which the nature of the work admitted; "and in such cases," said the Court, "Where the entire work is done at the general expense of the city, the statute ought not to be so construed as to exclude the city from availing itself of desirable patented works or improvements, as to which there is but one price, and for which there can, in the nature of the case, be no competition, and when for performing the work and furnishing materials, the advantage of competition is secured. * * * Under any other theory a municipal corporation would be obliged to forego the purchase and use of all patented implements, modes or processes—a result which we cannot think the Legislature contemplated." In the same case a prior decision of the same Court—*Dean* v. *Chariton*, 23 Wis. 590— was reviewed and limited. *Dean* v. *Chariton*, strongly relied on by the appellees, was decided by a divided Court and there was a vigorous and able dissenting opinion by CHIEF JUSTICE DIXON. The Legislature subsequently validated the assessments held void in that case, and the validity of that legislation was sustained. *Mills* v. *Chariton*, 29 Wis. 400. "In view of the legislation which followed *Dean* v. *Chariton*, and the fact that it was decided by a divided Court, and the general tenor of subsequent decisions, and the further fact that patented methods and processes now enter so largely into various classes and kinds of public work, we are not disposed," said the Wisconsin Supreme Court, "to extend the rule of that case beyond the particular point there decided." *Kilvington* v. *Superior*. The precise or particular point involved in *Dean* v. *Chariton* was the validity of an assessment against abutting lots for paving a street; whilst in *Kilvington* v. *Superior* the cost of the paving was borne by the city at large; and that

circumstance seems to be the ground upon which the two lines of decision in Wisconsin were distinguished by the Supreme Court of that State. *Kilvington* v. *Superior* was reaffirmed in *Rickston* v. *City of Milwaukee*, 105 Wis. 591, s. c., 47 L. R. A. 683. Substantially the same decision was made in *Hastings* v. *Columbus*, 42 Ohio St. 585, in which the fact that contractors owned a patent which must be used in executing the contract was held immaterial where before the contract was let the city had acquired the right to secure at a reasonable cost the right of the patent with respect to the improvement for any successful bidder for the work, so that the bidders were placed in this respect on substantially equal terms. In Michigan and New York the decisions hold that a municipal contract let to the lowest bidder is not invalid because the performance of the contract will require the use of a patent. *Hobart* v. *City of Detroit*, 17 Mich. 246; *Re Dugro*, 50 N. Y. 513; *Baird* v. *New York*, 96 N. Y. 567; *Mayor, &c., of Newark* v. *Bonnel et al.*, 57 N. J. L. 424, s. c., 31 Atl. R. 408. There are cases in other jurisdictions holding a contrary view, and JUSTICE BREWER in *Yarnell* v. *Lawrence*, 15 Kan. 129, adverts to the diversity of judicial opinion on the subject but was inclined to favor the views of the Courts of Michigan and New York. If the doctrine announced by the earlier Wisconsin, California and Louisiana cases and by some of the Illinois decisions be accepted, municipalities would be excluded from using a patented material or process, no matter how desirable or available it might be; though the only reason suggested in support of the doctrine is, that a failure to apply it will encourage monopolies and will open the door for raids to be made upon the public treasury by dishonest officials in collusion with equally dishonest owners of patented articles, when practically as good results could be secured for the public by the use of some other material supposed to be as well adapted to the proposed purpose as the patented one. Assuming that city officials are honest no reason can be assigned for prohibiting them from specifying or purchasing a patented article for the city, that does not,

with as much force apply to an individual or to a private corporation. If they are assumed to be dishonest their *power* under the charter is not curtailed by their dishonesty though, perhaps, by such a prohibition their opportunities for peculation might be lessened; and so would those opportunities be further decreased by additional restrictions, and the argument carried to its logical limit would require that such officers should be shorn of all power whatever, because, if they had no power in this regard they could commit no depredations on the public treasury. But confidence must be reposed somewhere, and legal principles cannot be permitted to vary with fluctuations in the moral character of municipal officers. Publicity in the proceedings of boards, next to integrity on the part of officials, is the surest preventive of fraud and corruption, for those vices flourish most in darkness and in secrecy, and if despite the best devised precautions, crookedness and jobbery are practised, the guilty when detected should be inexorably pursued and dealt with under the provisions of the penal Code. The powers and rights of the municipality, however, can never be measured by the mere accident of the honesty or dishonesty of the officials, if logical methods of reasoning are pursued but the validity of their acts may sometimes depend on the good faith with which they were done. Cities in the construction of public improvements, ought to have, as have individuals, in the construction of their own private edifices, the right to select for use the article or substance best fitted and adapted to the purpose ; and to deprive the public of the right to select and use such superior articles is opposed to public policy, and positively disadvantageous to the community. "The force of this argument must of course be admitted," said the Court in *Fishburn* v. *Chicago*, 171 Ill. 338, s. c. 39 L. R. A. 482, and the answer to it, which is more specious than sound as given by that Court is as follows: "It is readily seen it is not necessary to foster and create a monopoly, and prevent competition in the letting of public contracts, by providing in ordinances that a certain substance, or article, and no other, shall be used. If it be the judgment of

the City Council that the most suitable and best material to be used in any contemplated improvement is the product of some particular mine or quarry, or some substance or compound which is in the control of some particular firm or corporation, the ordinance might be so framed as to make such production, substance or compound the standard of quality and fitness, and to require that material equal in all respects to it should be employed." In other words, if the city requires a particular thing and that thing is covered by a patent, or can only be supplied by one dealer, the city must get, not the exact thing it needs, but something else as closely resembling it as can be procured. Thus if the city is in want of certain repairs for its fire engines and those repairs are made only by one manufacturer, or are protected by a patent, they cannot be purchased lest a monopoly would be fostered; but something, *not the thing needed*, though resembling the thing needed, would have to be substituted for it. But the Supreme Court of Pennsylvania has decided precisely the opposite way in *Silsby Manf. Co.* v. *City of Allentown*, 153 Pa. St. 319; s. c., 26 Atl. Rep. 646. Under the Illinois doctrine if a patented article is the very best that can be had and is the one most perfectly adapted to the use for which it is required, it cannot be contracted for by the city or be included in specifications, merely because it is patented, but an inferior article, not so well suited to the purpose, must be taken in its stead. The doctrine is self contradictory. "If it be the judgment of the City Council that the *most* suitable and *best* material to be used" is a monopolistic one, then it can be availed of only as a standard for comparison, and the city must prescribe that some *other* material "*equal in all respects* to it should be employed." But if the monopolistic article is the *most* suitable and the *best*, how can some other article be "*equal in all respects to it*," since the most suitable and the best can have no equivalents? The necessary result of the doctrine is to exclude the *most* suitable and the *best* article, and as no other article *can be equal* in all respects to the *most* suitable and the *best*, no other article could be chosen, because an impossible

one had been prescribed.    In *Holmes* v. *Com. Council of Detroit*, 120 Mich. *supra*, the Supreme Court of Michigan in dissenting from the Illinois doctrine said: "Municipal improvements afford an apportunity for corruption and jobbery, and the public opinion that it is not uncommon may be justified.    This is perhaps unavoidable, but whether it is or not we think the remedy is not that suggested, viz., to deprive the cities of the power to get what is desired, and compel them to take what is not wanted, or nothing.    We think the law is complied with, in the absence of actual fraud or corruption, when specifications are submitted to competitive bidding, although some article is specified, which, by reason of a patent or circumstance, is in the hands or under the control of a single dealer."

In 2 *Page on Contracts*, sec. 1050, it is stated that "where bids must be let to the lowest responsible bidder, the city may, if public interest require it, specify articles covered by patents so that competition is practically impossible," and a large list of cases is given in *note 2*.    We may refer also to *Swift* v. *City of St. Louis*, 180 Mo. 80; *Barber Asphalt Pav. Co.* v. *Hunt*, 100 Mo. 22; s. c. 8 L. R. A. 110; *Verdin* v. *St. Louis*, 131 Mo. 26; *Knowles* v. *City, New York*, 109 N. Y. 189; *Schuck* v. *City of Reading*, 186 Pa. St.; s. c. 40 Atl. R. 310; *Field* v. *Barber Asp. Co.*, 117 Fed. Rep. 925; *People* v. *Van Nort*, 65 Barb. 331; *Baird* v. *New York*, 96 N. Y. 567; *Hobart* v. *City of Detroit*, 17 Mich. 245; *Mayor, &c., Balto.* v. *Raymo*, 68 Md. 571; *Perine C. & P. Co.* v. *Quackenbush*, 104 Cal. 684.

We now come to the Maryland cases which have been relied on by the appellees to support their contention on this branch of the case, and a very brief review of them is all that is needed to show that they have no application in any way to the situation presented by the record now before us. We refrain from commenting on other cases cited by the appellees learned counsel in his exceedingly full and most excellent brief, because we have already protracted this judgment beyond reasonable lengths, and a separate examination of those cases

would merely show in detail what we have said as applicable
to some of them generally, viz: that in many of them the rea-
soning adduced in support of their conclusions does not strike
us as being either sound or consistent whilst others of them
depend on statutes or ordinances which are not similar to
those involved in these proceedings; as in *Mich. Pav. Co.* v.
*Painter*, 35 Cal. 699, and *Allen* v. *Milwaukee*, 106 N. W. Rep.
1099.

In *Packard* v. *Hayes et al.*, 94 Md. 233, the questions put
in issue and decided were entirely different from those raised
in this case, though *secs. 14 and 15* of the City Charter were
reviewed and interpreted in their relation to the facts then un-
der consideration.  Sealed proposals for the collection and
disposal of garbage were called for by advertisement and no-
tice was given that specifications and proposal blanks could
be obtained at the office of the Commissioner of Street Clean-
ing.  The specifications provided that "each bidder must sub-
mit with his bid the scheme of garbage deposit which he pro-
poses to establish  *  *  *  including such plan, specifica-
tions and other information as may be necessary to enable the
said commissioner to determine the feasibility of it."  Nothing
more definite concerning the scheme or plan to be bid upon
was contained in the specifications than the statement that
"the contractor must establish and maintain  *  *  *  such
scheme or schemes  *  *  *  as may be necessary to en-
able him or them to perform the work specified in his or their
contract."  Six bids were received and, as might have been
expected in consequence of the failure to prescribe any definite
scheme in the specifications, each bidder submitted a different
plan for the accomplishment of the work.  The specifications,
such as they were, furnished no standard for a comparison of
the several bids, as each bidder based his proposal upon his
own system.  There was consequently no competitive bid-
ding.  It was with reference to this condition of facts that we
said: "Necessarily then all the essentials that the municipality
designs that the contract proposed to be made shall contain,
are to be determined before proposals are invited, and are to

be placed before the bidder as the basis of his bid.     *     *     *
The object of the provisions of the municipal charter we are
considering (secs. 14 and 15) is to prevent favoritism and ex-
travagance in the making of municipal contracts. The effect
of these provisions to produce the result intended would be
greatly impaired, and the purpose of them might be entirely
defeated if the method of awarding contracts under them
which was pursued in this case, could be sustained. The ab-
sence of any definite and precise basis for competition among
the bidders; the allowing of each bidder to submit his own in-
dependent proposition as to what would form an important ele-
ment of the contract, and the reservation of a discretion to be
exercised by a municipal authority as to an essential of the
contract after bids had been submitted, make the contract
here the subject of controversy violative of the intent and pur-
pose of the provisions of the law in question as well as of the
essential character of competitive bidding." But it will be
observed that not a word is said nor a suggestion made that
alternative specifications, distinctly defining the precise thing
to be done under each, could not be employed with a view of
putting several methods of doing a particular thing in compe-
tition with each other. No such proposition was presented
and, of course, therefore, no such proposition was decided.
All the elements required to enable the bidder to submit in-
telligently his proposal on the kind of pavement he might
offer to lay, were plainly and minutely described in the set of
specifications relating to that character of pavement "before
proposals were invited" and no essential of the contract was
reserved for the exercise of any discretion by the municipal
authorities after the bids had been submitted. The case of
*Packard* v. *Hayes et al.* is obviously distinguishable from those
now at bar. The case of *Madison* v. *Harbor Board*, 76 Md. 395,
has no application at all. It merely determined that the de-
cision of the Harbor Board in awarding a dredging contract
will not be reviewed by the Courts on proceedings for a *man-
damus* unless it can be shown that there was fraud in making
the award.

The foregoing discussion and the authorities therein cited establish the following propositions:

First. That section 10 of the Act of 1904, ch. 274 is not void under sec. 29 of Art. 3 of the State Constitution; and that under that Act the Commissioners for Opening Streets are by virtue of Ordinance No. 216 approved March 6, 1905, clothed with the powers conferred by the Act; and that the. said commissioners have, under the statute and the ordinance just named, full power to pave such streets in the Annex as they may deem proper without the adoption of any other ordinances designating the streets to be paved.

Second. That under the statute and the ordinance just mentioned the Commissioners for Opening Streets have the right to select the kind of material to be used in paving Twenty-fifth street, regardless of the provisions of Ordinance No. 165 of February, 1899, since that ordinance has no application to the pending cases.

Third. That the Commissioners for Opening Streets had the power to put asphalt block, bitulithic and vitrified brick pavements in competition with each other, and after the bids had been opened by the Board of Awards, to select the one of the three pavements to be used, and that the Board of Awards had the power to award the contract to the lowest responsible bidder upon the kind or character of the pavement so selected, even though a bid had been filed on some other material which was lower than the lowest responsible bid on the selected material.

In many of the cases alluded to above and in others not referred to in this judgment the further proposition is decided, that such provisions as secs. 14 and 15 of the charter do not apply when the city proposes to purchase a patented article, because competitive bidding for such an article would be an idle and useless form; *Baird* v. *New York, supra*, but as competitive bidding was resorted to and was under the circumstances stated properly available in this instance, that proposition is not essentially involved in the disposition of these cases, though it was set up in the answer of the city and was

upheld by the Court below.    If the proposition were directly involved we should have no difficulty in yielding our assent to it, in a case where the patented article could not in the nature of the thing, be bid on or furnished except by the owner or licensee of the patent.

We have now stated at large the reasons which induced us on August the ninth last to reverse the decree in these cases, and to dissolve the injunctions and to dismiss the bills of complaint.

JONES, J. dissents as to the effect to be given secs. 14 and 15 of the City Charter.